May it please the court. Counsel, my name is Michael Filippovich. I'm with the Federal Public Defender's Office in Seattle. Along with me is Corey Endo. We represent Mr. Victor Kohring. Two things I would like to address before I get to my argument relate to questions asked by Judge Tsushima during the early argument. First, with respect to the other investigations, it's my understanding that the investigation by Mr. Schulke, which was initiated by Judge Sullivan, is in fact limited to the misconduct of the prosecutors in the Stevens case and that his directive is to investigate a criminal contempt, potential criminal contempt charge against those prosecutors concerning that behavior, and that he is not charged with investigating the behavior in the Kohring case or the Kotz cases. And I think that's important if the court is trying to weigh whether an evidentiary hearing should be held in this case and is assuming that these other investigations would cure any need for an evidentiary hearing. Our position is that it would not cure such a need, particularly with respect to Kohring. And secondly, Judge Tsushima asked about the decision in Kotz, which is directly relevant to the Kohring case, about Judge Sedgwick's ruling, whether it was based on both materiality and 403, and therefore whether it was subject essentially to an abuse of discretion standard on review. My reading of the Kotz decision, which was adopted in Kohring, is that Judge Sedgwick held that there was, in fact, a Brady violation for not turning over the evidence about the Sexson investigation and that the reason he denied relief was simply on his post hoc rule 403 ruling. So I would respectfully suggest to the court that he did not in any fashion make a materiality ruling on that issue. Getting to Mr. Kohring's case, I think we start in his case with the following propositions, which were accepted by the district court. First, the district court concluded that most of the points we identified in the withheld evidence, that most of those items were favorable to Mr. Kohring, that those items were, in fact, withheld from Mr. Kohring. That's at page 18 of his ruling. And significantly, he also found that these withheld items would have undermined confidence in the verdicts if the verdicts were based on the payments allegedly made to Mr. Kohring, at least with respect to either the Island Pub on February 23rd and the McDonald's to the Baranoff Hotel event on June the 8th of 2006. So where we begin the analysis in the Kohring case and begin the Brady-Giglio review is we recognize that Judge Sedgwick recognizes that the government case, even without the withheld information, was weak because the jury rejected by its acquittal on count two much of the government's case as to these payments under a reasonable doubt standard. In spite of these conclusions, however, and in order to salvage the convictions against Mr. Kohring, the district court did the following. It first assumed that the verdict on count three, the attempted extortion count, was based solely on the alleged request for a loan or help with Kohring's $17,000 debt. Secondly, and I would submit in direct conflict with the analysis required by Kyle's and by this court's opinions in Paradis and Jernigan, it effectively applied a sufficiency of the evidence analysis in this case as opposed to the appropriate confidence in the verdict of Brady-Giglio analysis. And it did so by essentially parsing out from consideration on its Brady analysis as irrelevant any exculpatory information having to do with these other payments, saying it's completely irrelevant to this attempted extortion based on the loan request, that even going so far as parsing out the event depicted on the tape, the exculpatory information relating to the handing of the two sums of money to Mr. Kohring by Mr. Allen. And third, and in direct conflict with this court's decision in Bagley v. Lumpkin, the Bagley case on remand after the Supreme Court decision, I would submit that the district court essentially substituted its view of the evidence for the jury's responsibility, and again, misapplying the standards of Brady-Giglio and Kyle's. Under Kyle's, Paradis, and Jernigan, the proper approach, I would submit, is to look at each item of withheld evidence first and determine if it's exculpatory. And after the court goes through that process, you then look at all of that withheld evidence and you essentially ask two questions. How would that withheld favorable evidence have damaged the prosecution case? And secondly, how would that withheld evidence have helped the defense case? And to the extent that the prosecution case would have been weakened and the defense case strengthened, does it undermine confidence in the jury verdict? Now, applying that approach here and looking at this cumulatively in context of the entire record, I think we need to look at what the case against Kohring really involved. There were a number of witnesses called, but there were really only four witnesses of significance. The most important witness, Bill Allen, the significant witness, Rick Smith, FBI agent Vanderplug, and the ethics expert, Joyce Anderson. And if we go through each of those and look at how the government used it and used those witnesses and how the Brady information undercuts them, I think it demonstrates why there should no longer be confidence in the verdict here. First, Bill Allen was used to establish that he gave money to Kohring on six to seven occasions and that it was in part to keep Kohring loyal with respect to the VICO interests. Now, trial counsel did a reasonably good job of chipping away in cross-examination on Bill Allen's testimony. But had the Brady evidence been disclosed, had the Giglio evidence been disclosed, he would have essentially destroyed Bill Allen as a positive witness for the government and to some extent used Bill Allen as a defense witness in this case. Specifically, Bill Allen told the prosecutors that Vic Kohring viewed him, Bill Allen, as a father figure. Now, if trial counsel had that information, that would have been a powerful metaphor to use in closing argument to the jury to explain why Vic Kohring is coming to him in the hotel room and asking him for advice and help with this $17,000 debt. That statement was not disclosed. Secondly- There's nothing in the record that suggests that they ever paid him $17,000 or any part of that, really. Is that correct? Oh, that's correct. They never paid him $17,000. And, in fact, the topic of this request for a loan was never, ever again mentioned after that date. It never comes up again. It doesn't come up again when Kohring calls later and offers help and describes what he's doing to contact legislators. He never ties it to that earlier request. The topic never comes up. And, in fact, I digress a bit here. That count that Judge Sedgwick relied on, the attempted extortion based on this request for assistance with the $17,000 debt, I would respectfully suggest is probably the weakest allegation in the government's arsenal at trial. And I say that because when you look at the tape and you listen to all of the words, the discussion for most of it is about options. And Vic Kohring somewhat naively and guilelessly says, oh, I'll go talk to Joyce Anderson. We'll try to figure this out. I want to make sure this is all above board. And it's Bill Allen who says, no, because of APOC, I don't want to raise any red flags. And then Vic Kohring says, well, I'll research it myself. But he keeps coming back in the conversation to his reporting requirements. He says, well, you know, if it's a loan of more than $5,000, I know I'm probably going to have to report this thing. And he's talking about this on the tape. He also says, oh, and by the way, if you give me a job and not a loan, then, you know, I'll have to report that too. Well, if this is an extortion attempt, I mean, that's kind of a bizarre conversation to be having in the context of an extortion attempt. So it's ‑‑ and one of the questions is, I don't know what the government is going to argue, if they're going to argue that this tape by itself convicts Mr. Kohring. But respectfully, they could not have won this case, particularly with respect to this attempted extortion account, based solely on this videotape evidence and what was reflected in the videotape. In fact, if one looks at the defense argument, John Henry Brown's argument, he uses this. There's two pages in this closing argument where he stresses all the words that Kohring said. And what he basically says is, what Kohring said is what he meant. And I think that is really an important point in the context of the really serious, one of the most serious Brady violations here, and I think how the government may have used this tape to convict him. And that is, it's not the words about the job. It's the visual of Bill Allen reaching in his pocket, giving Kohring some money, getting the money from Rick Smith, giving him money, then reaching in his pocket and giving him some more money. That was the most powerful evidence for the government. And why is that important to the attempted extortion? It's important if the story from the government is that these guys are just talking in code. In other words, they're talking about an Easter egg and he gives them $100. He mentions a Girl Scout uniform and Bill Allen hands him a stack or a handful of cash and it's $600 to $700. That suggests that there's a wink and nod, that this is really not meant for a Girl Scout uniform. And that explains why the government was so concerned on the eve of trial with this contradiction, direct contradiction between Rick Smith's memory of what happened and what Bill Allen happened. Rick Smith clearly remembered. There's no speculation, there's no assumption. The email says, Rick Smith recalled that when Allen gave him the second sum of money, he counted out five bills. The evidence in the record from the trial clearly establishes through Allen's testimony that he did not have any $100 bills, that he thought he had $20 bills. That was consistent with Rick Smith's memory of the situation in that email. But getting back to the point of this attempted extortion is what the government's burden was on this attempted extortion based on the $17,000 debt was to convince the jury that what Coring was saying on this tape is not really what he meant. That this was really a corrupt conversation, they're speaking in code, and what do they use? They use the visual in Allen's testimony, and they withhold, not only withhold from the defense, I submit to the court they presented a false narrative to the jury about what happened when John Henry Brown unwittingly puts before the jury at the suggestion of the district court Rick Smith's statement on plea of guilty where he says in this document, probably written by a prosecutor as is the common practice, that it was up to $1,100 that Bill Allen gave to Vic Coring during that event. All the time knowing that if Rick Smith was asked the specific questions, the right questions, he would have testified ultimately that it really could not have been more than $200. The reason this is important is it's a linchpin involving all four of these witnesses. It completely undermines not only Bill Allen's testimony on that day, it undermines his testimony that on all these other occasions that he was giving Coring approximately $600 to $700 or $1,000. It undermines or neutralizes the testimony of Joyce Anderson, the ethics expert, because if he's getting $600 to $700, if Coring's getting $600 to $700 for himself during a legislative session and not reporting it, it's a clear ethics violation. If he's only getting up to $200 and it's a gift for his daughter, there's no requirement to report it and it's not an unethical act. It undermines the government's use of the FBI agent regarding Coring's statements because Coring's statements to the FBI were consistent with what Rick Smith would have said. Coring told the FBI, listen, yeah, I did have this meeting with him, I did ask for help with the loan, and I recall receiving, after some further thought, he says, I recall receiving a gift one time that was about $100 for my daughter for an Easter egg. Substantially consistent with what Rick Smith would have said. So I see that I'm running out of time. There are many more details, so I'd like to reserve a little bit of time for rebuttal. Thank you. We'll hear from the government. Good afternoon, Your Honors. May it please the Court, Kevin Gingras on behalf of the United States. Central issue before this Court now is whether, in light of the government's post-trial disclosures, Victor Coring got a fair trial. The answer to that question is yes, and I'd like to offer three points as to why the government thinks that he did. As in Cott, the Coring's conviction on count three depended on unimpeachable video and audio recording, which caught him attempting to extort $17,000 from Bill Allen. I watched that tape yesterday. Have you looked at it recently? I've looked at it many times, Your Honor, and I have looked at it recently. And you tell me that that was an attempt at extortion? I think it was, Your Honor. If you look at the elements for attempted extortion, the government simply had to prove that Coring, who was a public official, attempted to obtain property that he knew he was not entitled to, knowing that it would be given in return for taking some official action, or an agreement that he would take some official action and that he takes a substantial step. Well, where in that tape is there any discussion of an action that he would take in response to a loan of $17,000? I think it comes at the very end. Again, this tape is not, and I'll describe it in one second, Your Honor, but I think this tape is not a mere glimpse of a conversation. It's 20 minutes long. And Coring approaches Bill Allen and Rick Smith in the heart of the legislative session where the PPT bill has just been introduced. He knows how important that bill is to VICO. Now let's just talk about what's on the tape. Right, and so the tape shows him approaching them at that time, and he says, I would like some assistance with my $17,000 debt in the form of a loan. He's desperate because his credit card payment is running out. And he prefaces it by saying that I'm afraid it could hurt me politically, that this is going to be a problem for me. And so I want to know if you can help me out, and I will offer some suggestions. And he throws out some suggestions, the loan, the job, and he's clearly filling them out. The end of that conversation, he says, now what can I do for you? Before they can answer, he answers his own question. Just keep lobbying on behalf of the governor's bill, right? Just keep lobbying my colleagues. What does he say? What's the wording on the tape? The wording on the tape, and I apologize, I don't have it exactly in front of me. It's pretty close to what I just said, which is, what can I do for you now? Just keep lobbying for the governor's bill, right? And then they start talking about certain specific state legislators that he's going to approach, and he's going to fill them out and see where they are, and he's going to report back. And, in fact, there are recorded phone calls the next day where he's calling Rick Smith and saying, just like we talked about, I approached, you know, X, Y, and Z, and, oh, and by the way, I'm now at the Senate side and I'm working the Senate side for you, and so I want you guys to know that I'm there for you. And so the government is confident that based on that recording, along with the recordings of the conversations before and after, that the attempted extortion meets, is encompassed all in the recordings, and that even because the conviction rests on Coring's own words, that any additional impeachment evidence or information with regard to Allen and Smith wouldn't have altered the jury's verdict on count three, which was going to be my second point. The third point that I was going to address was that because the $17,000 solicitation was also charged as part of the conspiracy in count one and the thing of value in count four, that the district court correctly concluded that the information about which Coring is now complaining would not have affected the verdicts on those counts also. You know, I'm not sure whether this was in the closing argument of the government in the car or the Coring case, they get kind of mixed up in my mind. We mix them up too sometimes. The government says, you know, this was going to be worth millions, in fact possibly billions to the company, and here we're having a situation where they won't even make a $17,000 loan to Coring. Well, the arrests happened, Your Honor, I believe in August of 2006. So who knows what would have happened if... Well, I suppose, but there was no discussion of the $17,000 after that incident. That's right, Your Honor. So he goes in and he says, I've got a debt of $17,000, and Bill Allen says, well, kind of hems and haws, let me think about it, let me think about it. And that's the end of it, right, as far as we know? Well, certainly as far as we know, and that's I think what supports the government's argument that the actual attempted extortion, again, it's not, the extortion doesn't happen. That's why it's charged as an attempt. And the government actually explained this to the jury in closing argument, that this was the only conduct being charged in count three as the attempted extortion because he doesn't actually get the money. And that goes to one point that I would like to make that Mr. Filippovich has made in the briefs, and that is that we don't really know whether the jury relied on $17,000 solicitation for count three. With respect to my friend, the only evidence in the record that meets the elements of the attempted extortion is the $17,000 solicitation. But, you know, it was a general verdict form, right? It was a general verdict form, Your Honor, but I think given the fact that it is the only evidence, given the fact that the government explained to the jury, and that is that the plaintiff's, excuse me, the post remand excerpt's record 647, in detail that this was charged as an attempt, that that is enough to support the conclusion, which the district court concluded. They've written in their briefs that the jury didn't get the indictment, but frankly there's nothing in the record to support one way or the other that the jury did or did not get the indictment. But the indictment also lays out that the $17,000 solicitation was the charge in count three. The focus on count three is on Vic Koren's intent, because it was an attempt, as I said. So any of this information that would impeach Bill Allen or Rick Smith cannot, would not have altered the jury's verdict on that count. And if I could just turn to the last point, this is one of the small universe of cases where you can tell what the jury did, based on the conviction on substantive counts and the acquittal on substantive counts. There are general verdicts, as Judge Thomas, as you pointed out, but it's clear even with the general verdicts what the jury did here. To borrow the phrase of the Second Circuit in the Brennan case, which we cite in our brief, the conviction and acquittals acted as special verdicts. You have composite counts in count one, the conspiracy count, and in count four, the bribery count, where the jury has to only find one of several overt acts or one thing of value. And you have a conviction on one of those acts, and you have acquittals on the other. So it's clear that the jury rejected certain pieces of evidence that happened to rely on Bill Allen's credibility and Rick Smith's testimony and relied on the videotape evidence that is encompassed with count three. If I can say one word about the Mannerite case, which Coring points to in his brief. Mannerite, the Lopez case from this court, which postdates Mannerite, makes clear that cases like Mannerite and DeLuca are unique, where you have objects of a conspiracy that are later found legally insufficient. That is, in cases where you have crimes that are charged in the indictment that end up not even really being crimes, the court is understandably hesitant to look at, to try and parse what the jury did in those situations. But Lopez shows that outside of those unique situations like Mannerite and DeLuca, that a reviewing court can look at what the jury did in general verdicts. Again, in some of these rare instances where just the way the charges are laid out and given what the jury did, the convictions that it made, counts that it convicted on and counts that it acquitted on, where you can determine what the jury did like it did here. So unless the panel has any other questions, I would yield the rest of my time to the court, but I would like to close with just one thought, and that is, there's a lot that's gone on in these cases, clearly, but this case is still about Victor Koren. And he understandably wants to make this about the government and about prosecutors, and he and others have made insinuations and allegations that, as painful as it has been to my predecessors, the government has not rebutted head on, because this is not the forum for them, quite frankly. The final issues in this case are about Victor Koren and whether he got a fair trial, and even with all the discovery, missteps, and mistakes in this case, we are confident that he did, and we respectfully ask the court to affirm. I would leave you with a final thought also. The government's conduct here was pretty reprehensible, and whether you wish to stake the reputation of the court on this case where you have a pitiful figure who couldn't even buy his food sometimes and ask for a loan of $17,000, which is refused to him. Now, take that thought back and talk it over with the government. I understand, Your Honor. I understand the frustration of the court. It's more than frustration. We like to have pride in our government and conduct, and I recognize that you two were here before. You had no part of that. But the question is whether you wish to buy into what they did. I appreciate your words, Your Honor, and I agree to some extent. I would, with respect, simply restate, though, that the focus in this case at the end of the day is about whether the defendant got a fair trial. That's part of the focus, isn't it? And so, with respect, we feel that he did, even given all of the, again, missteps and mistakes. And I will yield the rest of my time to the court. Thank you. Thank you. I very appreciate it, Your Honor. The focus is not only on Mr. Coring. Under the Napier argument, the focus is squarely, squarely on the behavior of the previous government lawyers. If they presented false evidence, if they allowed false evidence to go to the jury, it is about them as much as it is about Coring. And on the Napier issue, the standard of materiality is, in fact, less. If there's basically any possibility that it could have affected the verdict, the court should dismiss. We've laid out in our briefing why there's a Napier violation. I would respectfully suggest that false evidence was presented about the fact that Mr. Allen did not have cognitive and memory problems, despite the fact that the Brady material is replete with that information. There's a discussion between the trial prosecutor and his supervisors. There's a false testimony about up to $1,100 by Rick Smith. Again, that is discussed specifically in an e-mail from a trial prosecutor, apparently asking for some advice from the head of the public integrity unit. And then we have that trial prosecutor standing in front of the sentencing judge and saying, arguing that specific point and arguing the need for public integrity and transparency. And I would suggest that on this record, on this case, and on what happened in the two other cases, this case calls out for dismissal. Thank you, counsel. The case just heard will be submitted, and Ms. McCloud, you're still here as well. I want to say this. In the previous case, we were still well aware that all the issues that were not decided in the first case are still on the table for our decision. So we've confined this hearing to the Brady and the Pew and other arguments, but we fully understand that the issues that were argued to us in April of 2009 are still live issues, and we have them under submission.  Thank you very much.
judges: Fletcher B. , Tashima, Thomas